### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ANDREW AUSTIN** | : | **Case No. 26-cr-28** |
| | : | |
| **Defendant.** | : | |
| | : | |

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its request that defendant Andrew Austin be detained pending trial of this matter pursuant to 18 U.S.C. § 3142(f)(1)(A).  Mr. Austin is charged by way of indictment with two counts of Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), and one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).  Distribution of Child Pornography and Possession of Child Pornography are both crimes of violence, and there are no conditions or combination of conditions that will reasonably assure the safety of children in the community – particularly harm for children who are exploited and abused through online means – if Mr. Austin is released.  As detailed below, an analysis of the factors set forth in 18 U.S.C. § 3142 leads to the conclusion that detention is the only way to protect children in the community and to ensure the defendant's future appearance.

### FACTUAL BACKGROUND

In July of 2025, in search warrant case number 25-sw-185, United States Magistrate Judge Michael G. Harvey of the United States District Court for the District of Columbia issued a warrant

authorizing the search of a residence in Washington, DC. The warrant concerned violations of the TARGET OFFENSE committed by the occupant of the residence ("SUBJECT 1").

During the execution of the search warrant, which also authorized the search of digital devices contained within the residence, law enforcement collected several digital devices. During this search, CEHTTF members located SUBJECT 1's computer in his bedroom. SUBJECT 1's computer was open, powered on, and unlocked. A hard drive was attached to SUBJECT 1's computer.

That same day, SUBJECT 1 was arrested pursuant to an arrest warrant and criminal complaint. SUBJECT 1's cellular phone was located on his person and seized by the FBI, as authorized by the warrant.

Following the execution of the search warrant, attempts were made to copy the contents of the hard drive which was found attached to SUBJECT 1's computer. However, the hard drive appeared to have been damaged following SUBJECT 1's arrest, and law enforcement has been unable to review the contents of the hard drive.

Distribution of Child Pornography by AUSTIN to SUBJECT 1 (January 18, 2025)

During an interview, SUBJECT 1 advised that his interest in child pornography began in 2019 when a friend introduced the idea of child pornography to SUBJECT 1. Shortly after meeting this friend, SUBJECT 1 was introduced to K.M.

During SUBJECT 1's interactions with K.M, SUBJECT 1 observed K.M with a hard drive which contained child pornography. On at least one occasion, SUBJECT 1 and K.M. watched child pornography together and masturbated.

Eventually, K.M. introduced SUBJECT 1 to ANDREW AUSTIN.  SUBJECT 1 advised he spent time with AUSTIN on four or five occasions, and during two of those occasions, AUSTIN played videos depicting child pornography at his home in Washington, D.C.  During one of those two occasions, K.M. was also present and watched child pornography with AUSTIN and SUBJECT 1.

Text messages were located on SUBJECT 1's device between SUBJECT 1 and AUSTIN.  These text messages were also found on AUSTIN's device that was reviewed by law enforcement.  The text messages in relevant part read as follows:

*January 16, 2025*

SUBJECT 1: Hi there.  Was wondering if I can get some movies from you.  I'm hanging out with a friend on Saturday, and he wants to see some.

AUSTIN: Hey yeah, sure.

SUBJECT 1: That would be great!!! Do you have a hard drive I can borrow?

AUSTIN: I do not.

SUBJECT 1: Can I bring a chip by and burn some on it?

AUSTIN: Like a thumb drive?  When were you thinking of coming by?

SUBJECT 1: Tomorrow evening work for you?  [sends picture of microSD chip]

AUSTIN: Tomorrow evening I will be at a hockey game from 7 until like 10, but I'm free after that.  I could do tonight after I watch season 2 premiere of Severance.

AUSTIN: How big is that?

*January 17, 2025*

SUBJECT 1: I'm going to crash soon, but tomorrow night after 10 works. (Message liked by AUSTIN)[1]

SUBJECT 1: Only 512 gb. I think I have another one, if not, I'll go buy a hard drive tomorrow night.  Thank you sooooo much.

---

[1] This message was sent at approximately 12:00am on January 17, 2025, as a continuation of the January 16, 2025, conversation.

AUSTIN:  That should get you a good amount.  I think the total I have is less than 1 TB.

AUSTIN: No problem – will be good to see you again.  It's been a minute.

SUBJECT 1: It has been [three smiley face emojis].

AUSTIN: Hey-lo there.

SUBJECT 1: Hi there!!!

AUSTIN: So, turns out the hockey game is tomorrow

AUSTIN: And at the moment, I'm sitting here with none other than THE [K.M.]

AUSTIN: That's right.  Live and in person right here on my couch!

SUBJECT 1: Omg. Tell him hello! Can I come on over?

AUSTIN: Yes for sure.

AUSTIN: I'll be tidying up a bit when you get here but this way you guys can catchup

SUBJECT 1: Perfect. Remind me your address

AUSTIN: XXXX Rhode Island Ave[2]

AUSTIN: NW

SUBJECT 1: I'm on my way now

AUSTIN: Use the call box XXX[3]+Call

*January 18, 2025*

SUBJECT 1: Hey squirrel! [winky face emoji]

SUBJECT 1: Can I stop by quickly sometime between 4:30 and 5:00? I need to take my dog to the park a little after 5.

AUSTIN: Yeah, that works [Liked by SUBJECT 1]

SUBJECT 1: Thank you x 1,000,000

---

[2] This is the same address for AUSTIN that was later searched pursuant to a court-issued warrant.
[3] The code was the apartment number for AUSTIN.

*January 19, 2025*

SUBJECT 1: Thanks again for hooking me up! Hope you enjoyed the hockey game.

AUSTIN: You're welcome! You've tested it out and made sure it works on your laptop?

SUBJECT 1: It does!!!

AUSTIN: Excellent. And you use VLC player?

SUBJECT 1: Yeah

SUBJECT 1 advised the hard drive seized from his residence in July of 2025 was the hard drive AUSTIN provided to SUBJECT 1. SUBJECT 1 advised that AUSTIN had uploaded child pornography to the hard drive from a laptop at AUSTIN's home located at XXXX Rhode Island Avenue Northwest, Washington, D.C. SUBJECT 1 advised AUSTIN only uploaded specific child pornography that SUBJECT 1 requested to be uploaded to the hard drive. According to SUBJECT 1, the hard drive included hundreds of videos which primarily featured prepubescent boys as young as 6 or 7 and through pre-teens engaging in various sexual acts, including anal penetration of prepubescent boys by adult men.

<u>Distribution of Child Pornography by AUSTIN via Whatsapp (August 19, 2017)</u>

In a review of Mr. Austin's digital devices, Mr. Austin engages in a conversation with an individual identified by a phone number XXX-XXX-6288 via text message. In relevant part, Mr. Austin and the individual communicating from the phone number ending in 6288 discuss the following:

*August 15, 2017*

    6288: Happy birthday!![4]

    AUSTIN: Hey, thanks bro!  How ya doing?

    6288: Well!! You?!

*August 16, 2017*

    AUSTIN: Doing pretty well here.  Sorry, was on a road trip vacay around Virginia with my folks.  Finally back home.

*August 17, 2017*

    6288: No worries dude! I'm glad you're well :)

    AUSTIN: and now my folks have left so I can finally get back to my bate! It's been almost a week!

    6288: oh my goodness. Without perving out and jerking off, I fall apart

    AUSTIN: I know.  I'm gonna chain thru a pack of Reds jacking off on zoom or FetishMen.

    6288: woof – I don't know fetishmen.  I've heard there's some wild stuff on zoom.

    AUSTIN: Oh yeah.  Seen lots of pervy shit there.

    6288: oh fuck yes

    AUSTIN: Some hot fucking perv dudes too.  A lot of tweaked out weirdos too.

    6288: lol I imagine all types

    6288: if you want more detailed talk it's better on whatsapp or wickr

    AUSTIN: I have WhatsApp

    6288: same number there :)

Approximately one minute after the last text between AUSTIN and the phone number ending in 6288, AUSTIN begins a Whatsapp conversation with the individual, which is included below:

---

[4] AUSTIN's birthday is August 15.

*August 17, 2017*

AUSTIN: Hey it's Andy

6288: hey perv

AUSTIN: So yeah.  Some hot kp[5] screen sharing there.

6288: fuck yes bro.  I love it – do you have any??  Little boys make me so erect dude.

AUSTIN. Sadly no

6288: lol that's ok

AUSTIN: Lookin to see if anyone is sharing anything now

6288: awesome.  I wish I had a big collection of it

AUSTIN: Me too.  I need to find all these sexting teen boys.

6288: fuck yes.  I like those single digits

AUSTIN: Yeah they're hot.  I tend towards teens myself but as long as my perv bro is hard, I'm happy.

6288:  we can enjoy it all.  I'm pausing to do some filming.  Talk soon!

AUSTIN: Ok!

*August 19, 2017*

AUSTIN: Ok!  Damn, some great stuff on zoom right now.

AUSTIN: [*Sends a photograph taken of a laptop, which is projecting what appears to be an image of three nude prepubescent minor males. Two of the minor males can be observed touching their own penises*]

*August 20, 2017*

6288: fucking hot

AUSTIN: Thought you might enjoy that!

---

[5] kp can be used as a short hand for "kitty porn" or child pornography.

<u>Additional Conversations Found on AUSTIN's Devices</u>

Other chats recovered from AUSTIN's devices demonstrate that Austin engaged in a pattern of consumption and distribution of child pornography.  For example, in a Telegram message with an individual who will be referred to as USER 1, the following exchange occurred:

*September 8, 2024*
AUSTIN: RN I'm high snd [*sic*] horny AF

*September 17, 2024*
USER 1: Haha same

AUSTIN: Haha … attaboy!

USER 1: U got any hot taboo groups u can add me to on here or vids to share with me ?

[*chat continues*]

AUSTIN: So, I've fallen off the trail of any groups here.  I've got lots of things I'd love to share but not on here.  Not a safe space.

USER 1: Where then?  Signal?

AUSTIN:  I dunno … I don't really do any trading online anymore.  Usually just make copies in person. Where are you these days?

USER 1: In Los Angeles

AUSTIN: Fuck me.  How's life out there?

USER 1: I moved back a while ago. Good better then boring dc.

AUSTIN: I'm sure

USER 1: Signal is the most secure platform to use why can't u send it with signal?

[*chat continues*]

AUSTIN: I don't keep anything on my phone.

USER 1: You can read about signal it's safe not even fbi or any gov can access it because the type of encryption they use.

AUSTIN: I have it.  Just usually only use it for buying drgz. Lol

[*chat continues*]

USER 1: I messaged you in signal just now[6]

AUSTIN: OK … I was like … ummm … dat u?

USER 1: Yes I just got a burner number got for my signal.  Pound I miss rubbing our covks [*sic*] against each other.

AUSTIN: Yeah – me too … that was always fun.  And now I'm like "New and Improved with Extra Depravity" lol.  You ever gt back this way.

USER 1: I don't know if I will why.  Did u get to send me anything on signal?

AUSTIN: just if you did, it'd be fun to get together again and perv out w/ some actual real good stuff.

AUSTIN: I haven't yet. I'm trying to crank out some work stuff for this morning, but I'll try to send ya something here soon.

USER 1: I'm jerking off was hoping to watch some stuff that's why.

AUSTIN:  ok … lemme dig out my hard drive and send ya something.

USER 1: [prayer hand emoji] thank you

AUSTIN: we should do a zoom call sometime and get into it

USER 1: Yea I'm down we'll plan it.

AUSTIN: what kinda material would do ya good rn?  Feel free to respond on Signal if ya like

USER 1: U sent you 3 messages on there but you haven't responded to me.

AUSTIN: question on signal.  Ok – hope you enjoy. Couldn't really see much of what was selecting, so just sent a few recognized.

[*chat continues*]

---

[6] Law enforcement identified a separate conversation on Signal between AUSTIN and what appears to be the same USER 1.  The first chat in Signal is just two minutes prior to USER 1 sending this message and the conversation topic appears to be a continuation of this one.

*October 20, 2024*

    USER 1: Hey babe can you send me some more vids by any chance?

    AUSTIN: Hey there – bro – I'm not sending anything electronic any more. I can set up a room and share play some for you that way, or make a copy of the hard drive if you're ever back this way.  Sorry bud – I'm sure we can figure something out …

    On September 17, 2024, AUSTIN has a conversation with an individual who appears to be the same user as the above Telegram conversation.  They discuss the following:

    USER 1: Hi.

    USER 1: Hey you gonna send me anything?

    USER 1: Hi

    AUSTIN: what you wanna see?

    USER 1: Do you have any videos of like dad's fucking really young girls or something.  And that fucking boys

    AUSTIN: More boys than girls.  I know there's a ton of girl ones on here in folders I haven't even begun to make it thru yet.

    USER 1: Can you send me the folders?

    AUSTIN: they're pretty fucking huge and I gotta leave in <30 mn

    USER 1: Send me whatever you can

    AUSTIN: How yng is too yng?  If that exists for you.

    USER 1: I like anything but no baby's.  The younger the better.

    AUSTIN: Ok.  Same here.

    USER 1: Nothing older then 8 or 9.

    AUSTIN: [A message that has since been deleted was sent from AUSTIN to USER 1]

    AUSTIN appears to have conversation with K.M. about accessing a hard drive containing a folder titled "Try Again."  For example, in a conversation on February 22, 2024, the following

exchange occurs:

K.M.: Plug it into my Mac it ask for the password, plug it into my of finger unlocks it says needs to update that's as far as I get.

AUSTIN: Ouch

K.M.: Hurt yourself?

K.M.: Of – PC

AUSTIN: Woke up on couch.  Back: fucked.

K.M. Ouch.

AUSTIN:  Ok.  What password are you using?  It's not the [password] and [password] one. But I thought the finger should be enough to unlock it.  When it unlocks, you should be looking for a folder that's called Try Again.  Take a pic or screenshot of the Samsung app and send it to me.  Because, really once you've unlocked it either using the password or with the fingerprint there's no other use for that Samsung app. It's really just the lock that you need to unlock. It's not the gate that you get through to access the material. that you just have to find through your file explorer.

K.M.: [sends video of a laptop screen with a prompt asking for a password to be entered to unlock the disk "Try Again"]

K.M. That's Mac

K.M.: [sends a second video of a laptop appearing to access an external harddrive]

AUSTIN: Signal

K.M.:  Sends photograph of an update screen.

AUSTIN: Ok, does it let you update?  The fact that it says God and Proverbs is good.

K.M.: I'm in.

K.M.: Ty.

K.M.: Didn't update on my of needed it.

K.M.: Only.

AUSTIN: Ok.  Don't let anyone copy that yet – there may be some personal files on there that I don't want distributed.

11

K.M.: I wouldn't.

AUSTIN: Enjoy!

An additional conversation ranging from June 24, 2024, through the early morning hours of June 25, 2025, includes the following exchange referencing "Try Again.":

AUSTIN: I've been hatching some thoughts if you wanna stop by to bounce them off.

K.M.: Okay.  Give me 45 mins or so.

AUSTIN: Ok, no rush.  If u wanna come later that's fine too

[*approximately 2 hours and 10 minutes pass and the conversation continues*]

AUSTIN: [sends what appears to be a password]

K.M.: What's the folder name

AUSTIN: 1

K.M. It's restricted

AUSTIN: What do you mean?

KM: I can't open jt [sends picture of folder labeled "1" with a restricted symbol]

AUSTIN: Inside the Try Again folder?

K.M. Yes

AUSTIN: Well shit.

K.M. What's ur user name password

AUSTIN: No idea why that would be

AUSTIN: For the MacBook?

KM: Yea

AUSTIN: Should just be the other icon when you sign out as you, but it's Andy Austin and Pw is [provides what appears to be a password].  There's no hyphen in that if it split lines

K.M.: Perfect

AUSTIN: Cool

<u>Additional CSAM Found on AUSTIN's Phone</u>

On October 21, 2025, a search warrant was executed on AUSTIN's residence.  During the review of the digital devices collected from AUSTIN's residence, images and videos depicting child pornography were observed.  As of the date of the filing of this memorandum, two of the digital devices obtained during the search of AUSTIN's residence have not been reviewed due to technological challenges.  However, during review of the devices collected, the FBI has identified approximately 28 files as child sexual abuse material, with another approximately 96 files identified as child exploitive/age questionable.  Four of those files are identified further below:

   o   The file identified as "**08-OCJWXT8yuJdnBCc0RoV1NZamc**" is a video that lasts approximately 10 minutes and 15 seconds.  When the video begins, it shows an adult male without a t-shirt and a clothed prepubescent minor male. Approximately one minute into the video, the adult male removes the minor male's clothing. Shortly after, the adult male attempts to insert his erect penis into the anus of the minor male.  At approximately two minutes and 45 seconds into the video, the adult male inserts the minor male's penis into his mouth, and then shortly after, the adult male places his erect penis into the mouth of the minor male.  The minor male in this video appears to be prepubescent due to a lack of pubic hair and his small body size relative to the adult in the video as described below.   The video continues to show other scenes involving what appears to be the same minor male. At various times throughout the video, the adult male places his erect penis into the

minor male's mouth, places the minor male's hand on his erect penis, and touches the minor male's penis.

o   The file identified as "**AD14086F01D8FDF3B131F62EEF9DAD7BD778C7 B38C11E80CBC3191D561D8FF13_sk_6_cid_1.png**" is an image that depicts two minor males, with what appears to have one minor male's penis inserted into the mouth of the other minor male.  The words "Guest" can be observed in the bottom left corner of the image.

o   The file identified as "**8ECC37789D22625478B8DFBD02D0BF8E6E6B7fC2 AEE28BE4F1EFE9F5FFAD25BV_sk_6_1.png**" is a photograph that depicts two nude prepubescent minor males, with one minor male bent over in front of the other. One of the minor males' penis can be seen touching the buttocks of the other minor male.  This photograph is visually similar to a video law enforcement has previously reviewed which depicts two prepubescent minor males engaged in various sexual acts, to include oral and anal sex.  The minor males in the video, and in the aforementioned file identified on AUSTIN's devices, appears to be prepubescent due to a lack of pubic hair.

o   The file identified as "**vlcsnap-2023-10-18-04h52m06s811.png**" is a photograph that depicts a clothed adult male laying on a bed who appears to be anally penetrating a minor male who is sitting on the adult male.  This photograph is visually similar to a video law enforcement has previously reviewed which depicts a clothed adult male, with his penis exposed through his underwear, anally penetrating a prepubescent minor male.  The minor male in the video, and in the

aforementioned file identified on AUSTIN's devices, appears to be prepubescent due to his small body size relative to the adult in the video.

In addition to the CSAM found on AUSTIN's hard drive, law enforcement were also able to review titles of prior played videos from AUSTIN's VLC media player on AUSTIN's computer. The videos were not able to be viewed because they appear to have no longer been on the computer itself, which is consistent with AUSTIN plugging in a hard drive an playing those videos from the hard drive. The videos appeared to be from a folder called, "Try Again," which has been discussed with other individuals, including an individual with the initials K.M. and appears to be a folder that AUSTIN shared with other people that contained CSAM. The following titles were observed on AUSTIN's prior played videos in his VLC media player:



While these videos were unable to be viewed, the titles often include ages and sexual acts being performed.

## PROCEDURAL HISTORY

The defendant was arrested on February 23, 2026,[7] and made his initial appearance on the same day. On the government's motion, the defendant was held pending a detention hearing, which is scheduled for February 25, 2026. The government now respectfully submits this memorandum in support of its motion for pretrial detention.

---

[7] Defendant surrendered himself on the morning of February 23, 2026, to the FBI.

## APPLICABLE LEGAL STANDARD

The defendant is charged by indictment with two counts of Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), and one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).  Both of these charges are statutorily defined as crimes of violence.  18 U.S.C. § 3156(c) defines a "crime of violence" to include violations of Title 110, under which §§ 2252(a)(2) and (a)(4)(B) both fall.  Further, § 2252(a)(2) gives rise to a rebuttable presumption of detention pursuant to 18 U.S.C. § 3142(e)(3)(E), where it is to be *presumed* that no combination of conditions will protect the community or assure the defendant's return.  § 3142(e)(3)(E).  This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption."  *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released"); *see also United States v. Hir,* 517 F.3d 1081, 1086 (9th Cir. 2008).  Even if the defendant does not pose a flight risk, danger to the community by itself is a sufficient reason to order pretrial detention.  *United States v. Salerno*, 481 U.S. 739, 755 (1987).

In determining whether the defendant has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  *See* 18 U.S.C. § 3142(g).  Even when the defendant has offered

evidence to rebut the presumption of dangerousness, the presumption remains a factor in the court's analysis of the § 3142(g) factors.  *See United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1983) ("Use of that word [rebutted] in this context is somewhat misleading because the rebutted presumption is not erased.  Instead, it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g).").  As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the courts.  Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial."  *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

## ANALYSIS

Mr. Austin poses a significant danger to children in the community – including children who are being preyed on over the internet as well as children in the physical world – and there are no conditions short of detention that will protect children from his predation.  For the reasons addressed below, the factors outline in 18 U.S.C. § 3142(g) weigh in favor of detention and Mr. Austin cannot rebut the presumption that he shall remain detained.

### A.    Nature and Circumstances of the Charged Offense

Mr. Austin's conduct in this case poses a risk to children in the physical and online world. Mr. Austin has engaged in a pattern of child exploitation through the distribution and consumption of child sexual abuse materials ("CSAM"), with a specific interest in young boys.  Mr. Austin appeared to be active in online groups distributing and consuming CSAM, including joining other individuals who were consuming CSAM through Zoom rooms, even sharing one of those images

with a person via Whatsapp.  Moreover, AUSTIN appears to have been regularly distributing materials through burning hard drives of what may have been up to 1 TB in CSAM based on AUSTIN's own text messages to SUBJECT 1.

As Chief Judge Boasberg noted in considering the government's appeal of the magistrate court's release order in *United States v. Reid*, 25-cr-311 (JEB), it is important to consider where the defendant's behavior falls on the spectrum of conduct commonly seen in child exploitation cases. At one end of the spectrum are individuals who distribute a single image of child pornography. At the other end are defendants who are engaging in hands-on abuse of a child or running forums dedicated to trading child pornography. AUSTIN's conduct falls in at least the middle of that spectrum. AUSTIN appears to have engaged in child exploitative behavior through the distribution and consumption of child pornography for years, starting as early as August 2017. His actions weren't limited to individual viewing or the sharing of one image, but instead, AUSTIN shared hundreds of child exploitation materials via hard drive and it appears he did this on multiple occasions.  That AUSTIN chose to distribute child pornography through hard drives and showed a general distrust of even the most secure online platforms demonstrates his sophistication and his largely successful efforts to hide his illicit conduct.  Moreover, AUSTIN would host people at his house to consume child exploitation material.  This weighs more heavily in favor of detention.

Mr. Austin's conduct demonstrates that he poses a danger both to children in the physical world and to children who are suffering the aftermath of having images of their sexual abuse distributed online.  On a broad level, children depicted in sexually explicit images and videos are victimized at the time the images were created, and they are re-victimized each time an individual, like the defendant, views the images for their own sexual gratification. As explained by the Sixth Circuit in a child pornography case:

...we have numerous victims in a case like this, not one victim. Every image of a child, every image of a non-adult engaged in any type of sexual activity or any type of pose without clothing or any type of exploitation constitutes an additional case of victimizing a child. Without a demand for that type of information and that type of viewing from persons like this defendant, we don't know how many child abuse cases we could prevent. And as long as there is a demand to purchase images of child pornography, there is going to be an unending stream of child abuse of…children who are forced into these roles.

...every image has a child who has been exploited and abused, and that is the concern I have. It is the concern that I have when people are engaged in serially doing this, the effect it has on children throughout the world and the effect it has on their future lives.

*See United States v. Miller*, 665 F.3d 114, 121-122 (6th Cir. 2011) (quoting the district court) (rejecting an attack on the child pornography sentencing guidelines and highlighting the grave harm caused to the victims depicted in child pornography images and the evidence that traffickers and possessors of child pornography are the impetus for the creation of more sexual abuse of minors).

Indeed, Congress has recognized the serious nature of crimes involving child pornography and the long-term damage that these crimes can cause, by specifying that these crimes carry a rebuttable presumption of detention.  § 3142(e)(3)(E).

The circumstances of Mr. Austin's actions are serious.  Mr. Austin provided hundreds of videos via hard drive and appears to have done that on several occasions, creating tangible harm by distributing recordings of the exploitation and abuse of real children.  Moreover, AUSTIN is actively contributing to the market for CSAM, further endangering children in the physical world. By consuming CSAM, organizing opportunities for people to come to his house to watch CSAM, engaging in Zoom rooms with other individuals viewing CSAM, and distributing CSAM to others, AUSTIN is actively contributing to the demand for videos of children being raped and abused.

In these circumstances, there is no combination of conditions that will protect children both online and in the physical world from the danger posed by the defendant and the Court should detain Mr. Austin pending trial.

**B.    The Weight of the Evidence Against the Defendant**

The weight of the evidence against the defendant is strong and weighs in favor of detention. The government is in possession of the chats between AUSTIN and SUBJECT-1, which were located on both AUSTIN's phone and SUBJECT-1's phone.  SUBJECT-1 confirmed that, in fact, AUSTIN provided a hard drive filled with hundreds of videos and images of child pornography. Moreover, there is additional evidence of distribution on AUSTIN's phone, including distribution through Whatsapp in August 2017 and various other conversations about child pornography, the abuse of children, the provision of hard drives for the purpose of AUSTIN providing CSAM to others, and efforts to evade law enforcement through use of encrypted messaging, screen sharing, and physical hand offs instead of messages. Further, the government is in possession of Mr. Austin's other devices, which contain additional CSAM files and conversations with other individuals interested in CSAM.

A district court must consider the weight of the evidence when assessing whether the defendant is a danger or poses a risk of flight and has broad discretion to determine the relative weight of each of the four Bail Reform Act factors. *See United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *9 (D.D.C. Feb. 6, 2023), *aff'd,* No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) ("First, nothing in the BRA's text requires or alludes to a differing weighing of the factors nor any hierarchy among the factors.").  No factor is categorically of greater or lesser weight than the others.  As the Second Circuit Court of Appeals observed:

> Although § 3142(g) of the Bail Reform Act lists various factors to consider, it says nothing about the relative weight a court should give them when deciding whether

> to release or detain a defendant. *See generally* 18 U.S.C. § 3142(g). That silence is
> unsurprising, because the weight given to each factor will inevitably vary from case
> to case, and might even vary depending on whether the inquiry relates to a
> defendant's danger or to his risk of flight. What is more, certain factors might
> interact with one another in a particular case in a way that alters a court's analysis
> of a defendant's danger to the community or flight risk.

*United States v. Zhang*, 55 F.4th 141, 149-50 (2d Cir. 2022). In *Zhang*, the Second Circuit found

that the district court gave appropriate weight to the second factor – the weight of the evidence –

in determining that there was "significant evidence" that Zhang had in fact committed the charged

murder. *Id.* at 150-51. Affirming the district court's relative reliance on the weight of the evidence

in determining dangerousness, the court explained:

> In making a predictive assessment of the defendant's future dangerousness if
> released into the community, common sense and § 3142(g)(2) aligned with the
> district court's consideration of the strength of this evidence, especially coupled
> with the nature of the charged offense. It stands to reason that the more strongly the
> evidence indicated that the defendant committed the murder, the more likely he
> poses a danger to the community if released on bail.

*Id.* Similarly, in considering whether the defendant poses a risk of flight, the court explained that

where "the evidence against a defendant is strong, it follows that the defendant faces an elevated

risk of conviction (and of the attendant punishment), and therefore may present an elevated risk

of flight. *Id.* at 151-52.

The *Zhang* court's analysis has been cited approvingly in the District Court of the District

of Columbia in *Blackson*, and its analysis holds true here as well. *Blackson*, 2023 WL 1778194,

at *9-10. The evidence against Mr. Austin is strong, suggesting a heightened danger to the

community. The strength of the evidence strongly supports detention, as it indicates the significant

risk of danger posed by the defendant.

### C.    History and Characteristics of the Defendant

The defendant, in addition to charges before the District Court of the District of Columbia, is currently charged with one count of Possession with Intent to Distribute a Controlled Substance in 2025 CF2 013887.  These charges came about during the execution of a search warrant on AUSTIN's home when law enforcement recovered approximately 11 grams of white crystal powder and crystal shard that tested presumptively positive for methamphetamine.

The Gerstein Affidavit Filed in 2025 CF2 013887 further describes the current pending matter:

> The members located the suspected narcotics on a coffee table in the living room in a black in color tin bin. The members located a small plastic cup containing a large shard of a clear crystal-like substance along with a clear crystal-like powder in the cup along with a small metal spoon inside the cup. The members also located four clear Ziploc baggies containing a clear crystallike powder. The members later weighed the substance and found that it weighed approximately ten grams.

> A search of the immediate area near the recovered suspected narcotics led to the recovery of several Ziploc baggies identical to the ones recovered with a clear crystal-like substance, numerous clear cups like the one recovered with the large clear crystal-like shard and powder, and a digital scale. Members searching the residence also located needles, pipes, and butane lighters which is consistent with the use of methamphetamine.

> A member of the FBI CEHTTF asked [AUSTIN] if there was anything dangerous in his residence, and [AUSTIN] advised the member that there were needles in the residence. [AUSTIN] reported that the needles were loaded with "Trimax or Meth." No needles containing methamphetamine or "trimax" were found or seized. A member of the FBI CEHTTF conducted a field test of a portion of the clear crystal-like substance for Methamphetamine. The portion tested field tested positive for Methamphetamine. Deputy US Marshal (DUSM) Lee conducted a separate field test of the crystal shard found in the plastic cup which contained a 2.5g white crystal-like rock - this sample also tested positive for Methamphetamine. Four separate small plastic ziploc baggies containing white crystal-like powder and one plastic cup containing a 2inch crystal shard, four additional empty plastic ziploc baggies, a scale, and a small metal spoon was seized and placed into US Marshals Service custody for evidence. The small metal spoon was inside of the plastic cup containing the 2.5g crystal shard that appears to be used to break up the crystal shard into smaller crystals. The total weight of the four ziploc baggies (containing white crystal-like powder) and plastic cup (containing the white crystal-like shard) was 14.8 grams, and one seized empty ziploc baggie weighed in around .8 grams. The total estimated weight of the white crystal powder and crystal shard that tested positive for methamphetamine is around 11 grams. DUSM Lee's training and experience estimates the approximate street value of crystal methamphetamines at around $80 per gram, placing the total value seized from [AUSTIN]'s residence at around $880, and an amount (11 grams) more consistent with distribution and not personal use.

AUSTIN has been on release in his 2025 CF2 013887 matter, starting on October 21, 2025.

According to the Pretrial Services Agency report, it appears that AUSTIN has not been in complete

compliance.  The Pretrial Agency Report notes that AUSTIN was failing to conduct check-ins as required and failed to report for drug testing on at least one occasion.[8]

Moreover, AUSTIN readily tells a friend over chat that he uses an encrypted messaging app, Signal, to purchase drugs in September 2024.  Specifically, AUSTIN writes via Telegram, "I have [Signal].  Just usually only use it for buying drgz. Lol."

In addition, while the defendant does not have any criminal convictions, there is reason to believe that he has engaged in criminal conduct for an extended period of time prior to his arrest in this matter.  The government's evidence shows that the defendant was communicating with multiple people regarding the sexual abuse of children and exchanging CSAM as early as 2017.  The defendant's desire to seek out a community of like-minded individuals who are interested in the sexual abuse of children demonstrates that his conduct in this case was not one instance of poor decision making.  The sophistication and surreptitiousness with which he distributed large amounts of CSAM demonstrate his comfort in doing so and likely experience in collecting and distributing CSAM.  This evidence shows that the defendant's lack of criminal history does not accurately portray his history of criminal conduct.

Thus, the defendant's history and characteristics weigh in favor of detention.

### D.    The Nature and Seriousness of the Danger to Any Person or the Community

Finally, the sexual exploitation of children presents a serious danger to the community, which results in severe mental, emotional, and physical trauma to the countless children who are victimized by offenders like the defendant and others with a demonstrated sexual interest in

---

[8] In addition, according to a prior Request for Judicial Action Report, filed on December 4, 2025, AUSTIN tested positive for illicit substances on October 27, 2025, though had tested negative on all other tests through the date of filing of that report.  The Pretrial Report notes missing a drug test on December 22, 2025, and a positive test for opiates on February 3, 2026, which was explained based on provided medical documentation verifying a prescribed medication that caused the positive drug test.

children.   It is this type of harm that led Congress to create the statutory presumption of detention in these cases.

That child pornography offenses are serious is a fact noted by the Supreme Court. At least as early as the landmark decision, *New York v. Ferber*, 458 U.S. 747 (1982)*,* the Supreme Court referenced numerous research materials detailing the harm to children as a result of the production and trafficking of child pornography.

> [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography."

Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake Forest L.Rev. 535, 545 (1981).  *See also* Child Exploitation 292 ("[I]t is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions"); Note, Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation, 12 U.Mich.J. Law Reform 295, 301(1979)(interview with child psychiatrist) ("The victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child"). 4 58 U.S. 758, n.9.

Moreover, as the Eastern District of New York has found:

> ...the issue is not only defendant's potential abuse of children and his interaction with children if on bail, but also his ability, if he is released on bail, to attempt to possess additional child pornography, or to communicate and interact with (via email, internet, or phone) others involved in the possession, sale, and distribution of child pornography or other sexual abuse of children, which would also create a clear danger by facilitating the criminal and dangerous exploitation of children by other individuals.

*United States v. Reiner*, 468 F.Supp.2d 393, 397 (E.D.N.Y. 2006).  The *Reiner* court further found that there were no conditions in that case that could reasonably assure the safety of the community

"[i]n this day and age, with devices such as cellphones, Blackberries, and laptops..." *Id.* at 399; *see also United States v. Blankenship*, 2008 WL 1925137 (S.D.W.Va. April 29, 2008) (unpublished) (noting the ease of accessing the internet by means of various devices and stating "[t]he Court finds that the evidence clearly and convincingly establishes that, confined to his home and electronically monitored, defendant would not be prevented from obtaining the means to access the internet and attempting again to obtain child pornography and in this poses a danger to children and the community"); *United States v. Doyle,* 2007 WL 1097844, *1 (W.D.Va. 2007)(finding danger of future offenses "especially considering that pornographic images of children are widely available on the internet and can be easily accessed by a personal computer"), conviction rev'd on other grounds, 650 F.3d 460 (2011).

As mentioned above, by consuming and distributing CSAM, AUSTIN's actions both endanger any child that is captured in the videos and images viewed or distributed by perpetuating continued trauma and harm on those victims AND further endanger children in the physical world by actively contributing to the market for CSAM. The nature and seriousness of the danger posed is significant, particularly given AUSTIN's sophistication with technology, allowing his actions to go undetected for years.

This dangerousness is exacerbated by AUSTIN's ability to keep his illicit activities secret. AUSTIN uses encrypted chats like Telegram and Signal, which in his own communications is acknowledged as a chat that is unable to be tracked or seen by FBI or government. Even in the Signal chat found, AUSTIN has apparently had messages likely containing CSAM deleted. AUSTIN distributes CSAM by creating zoom rooms to view (instead of sending a file), or by having people come to his house, or by copying hard drives – all to avoid detection from law enforcement.

The risk the defendant poses to children in the community is significant and weighs heavily in favor of detention.

## THIRD PARTY CUSTODIAN

At this time, we have no information regarding a third-party custodian for the defendant. The government would request an opportunity to provide further argument if a third-party custodian is presented.

However, there are parts of this specific case that provide increased concern that a third-party custodian could not provide the Court the assurances necessary to ensure the safety of the community.   Specifically, the defendant has apparently been engaging in this illicit behavior without detection from friends, coworkers, or family for almost a decade.   The defendant has shown a sophistication and ability to use deceit to hide his criminal conduct, including the use of encrypted applications, deleting or otherwise removing messages that might be incriminating, and using hard drives and zoom rooms to avoid detection.

In this jurisdiction, magistrate judges have generally detained defendants charged with child exploitation offenses due to the difficulty in adequately monitoring their conduct while on release.   These are offenses that occur online and are easy to conceal from the people closest to the defendant.

The issue with monitoring has been wrestled with by judges across the when deciding to detain defendants in these child exploitation offense cases:

- *United States v. Jose Martinez,* 22-cr-78 (ABJ) – Judge Howell affirmed the magistrate judge's decision to detain a defendant charged with possession of child pornography where his mother and sister were considered inadequate third-party custodians due to their presence in the home when the defendant committed his

offense.

- *United States v. James Carroll*, 24-cr-544 (APM) – Judge Mehta denied defendant's motion to review the magistrate judge's detention order for defendant charged in connection with chatting with an undercover agent, where his wife was his proposed third-party custodian. Judge Mehta went on to say that even if no access to devices was a condition of his release, "I simply just don't trust, given his compulsiveness and his demonstration of a high degree of sophistication, that he won't be motivated to somehow gain access to devices."

- *United States v. Eduardo Vides*, 24-cr-216 (BAH) – Judge Howell granted the government's motion to detain the defendant who was charged with distribution of child pornography and holding that the defendant's family members were inadequate third party custodians because his "family was unaware of his alleged criminal conduct, and due to the private nature and use of electronic devices in his purported offenses, it would be difficult for defendant's family to monitor him to the extent necessary to ensure his compliance with his conditions."

- *United States v. Victor Blythe*, 25-cr-253 (DLF) – Magistrate Judge Harvey granted government's motion to detain defendant charged with distribution and possession of child pornography where defendant's brother was proposed third-party custodian, noting "the alleged criminal conduct with which Defendant is charged occurred over the span of many years without detection by his family or community members." ECF 19-1 at 7. Judge Friedrich upheld this decision on the defendant's appeal.

- *United States v. Joseph Farina,* 25-cr-232 (RCL) – Judge Lamberth denied the defendant's motion for release. The defendant was charged with distribution and was alleged to have distributed to an UC in the context of expressing interest in watching CSAM with others and joining groups for that purpose and making efforts to meet up with the UC in person to watch CSAM. Though the defendant presented multiple individuals who could act as a third-party custodian (and numerous letters of support), the Court concluded that, "[t]he government is rightfully concerned that these family members 'would not be able to sufficiently mitigate the risk that this offender poses given what we know about his conduct and the trajectory that he appears to be on.'" ECF 23.

*See, also*, Order at 9, ECF No. 54, *United States v. Cunningham*, 23-CR-7 (D.D.C. Mar. 13, 2023) (Cobb, J.) ("[A] third-party custodian, no matter how competent or dedicated, cannot stand in the shoes of the defendant. Nor should a third-party custodian be cast in the role of jailer. To do so is neither realistic nor fair to the custodian. . . . [The defendant's] custodians cannot supervise his behavior on a 24/7 basis."); Order at 14, ECF No. 18, *United States v. Wright*, 22-CR-410 (D.D.C. Dec. 23, 2022) (Cooper, J.) ("But family members are not correctional officers. Nor should they be expected to play that role").

While the Government understands that every case is different, these cases all highlight an important reality – a crime committed with such a ubiquitous tool, especially by a sophisticated actor like AUSTIN, is nearly impossible for an untrained family member, even with the best of intentions, to monitor with the level of precision that would guarantee the safety of the community, including the children victimized by the consumption and distribution of images and videos of CSAM. *United States v. Hoppe*, 23-cr-102, discusses this very challenge:

The Court is not convinced that these proposed conditions would reasonably mitigate the risk Defendant's release would pose to the community. First, it is generally true that, in cases "involving illicit online conduct involving a minor, a defendant cannot establish that an appropriate third-party custodian exists, since, given the ubiquity of internet-capable devices, ensuring against continuing illegal conduct on release often presents insurmountable challenges." *United States v. Dhavale*, No. 19-mj-92, 2020 WL 1935544, at *5 (D.D.C. Apr. 21, 2020). That principle applies foursquare here. Defendant's papers make clear that her proposed third-party custodian has multiple internet-capable devices in her home, including a computer, an iPad, and a cellphone. *See* Def.'s Suppl. Mot. at 3. Defendant asserts that these devices would be difficult to access for multiple reasons. *See id.* But Defendant does not assert that her aunt would be able to monitor her at all hours of the day. Nor is the Court persuaded that Defendant would be unable to access any other internet-capable devices. Defendant "needs only a hand-held device to access and/or distribute child pornography." *See Galarza*, 2019 WL 2028710, at *6. And because Defendant's aunt cannot provide round-the-clock monitoring, "the absence of such small devices in [Defendant's aunt's] residence cannot be meaningfully verified on a continuous basis." *See id.*

*United States v. Hoppe*, No. 23-CR-102, 2024 WL 1990452, at *6 (D.D.C. May 6, 2024) (Contreras, J.).

Indeed, district courts in this jurisdiction have recognized the challenge faced by third-party custodians—who are essentially being asked to act as correctional officers 24 hours a day for someone about whom they care deeply—and have repeatedly rejected such arrangements as inadequate to reasonably assure community safety.

As noted by the Court in *Breeden*, "[w]hile [Pretrial Services] would be in a position to provide GPS monitoring if defendant is equipped with an ankle bracelet, and it would be alerted if he left the house, it does not have the capacity to monitor compliance any of the other conditions, including whether defendant was ever left unsupervised in the home, whether he used a computer, whether he accessed sexually-explicit or dating websites or engaged in troubling chats or communications, and whether he had contact with any minors. In other words, it would be the defendant's parents, and the defendant's parents only, who would be charged with monitoring and enforcing the conditions of release." 2015 WL 13310427 at *6. This highlights the concern with

third-party custodians in cases involving online crimes, as discussed above.

This Court cannot be assured that the defendant will follow the conditions of release and cannot ensure community safety if he remains released.

## **CONCLUSION**

For all of the reasons set forth above, a consideration of the evidence in this case and the applicable statutory factors compels the conclusion that the defendant should be detained pending trial.

Respectfully submitted,

Jeanine Ferris Pirro
United States Attorney

By:     */s/ Richard Kelley*
Richard Kelley
DC Bar No. 1026390
Assistant United States Attorney
601 D St NW
Washington, DC 20530
(202) 834-3571
richard.kelley2@usdoj.gov